GARRISON, Judge.
This case arises out of the December 8, 1979, election for Parish President of St. James Parish. The tabulation showed Paul Keller to have been the apparent winner, with 4,446 votes, and Richard Roussel, Jr., to have been in second place, with 4,444 votes.
Roussel contested the election in a suit (No. 13,860) filed in the 23rd Judicial District Court, and followed this with a subsequent suit (No. 13,862). At a hearing held on December 17, 1979, the absentee ballots were recounted in response to plaintiff’s initial petition (No. 13,860) and the district court ruled that all absentee ballots were valid and had been properly counted.
Although the two suits below had been consolidated, plaintiff-appellant appeals the *82 second suit (No. 13,862), wherein Judge Le-Sueur also found for the defendant. The latter suit, which we here consider, had constituted a general challenge by Roussel with regard to the election results, along with particular allegations of improperly or illegally cast and/or counted votes. The plaintiff alleged “irregularities, widespread and pervasive, throughout the parish, of such a serious nature as to make it impossible to determine the correct result of the election” and asked the court to declare the election void. The plaintiff alleged that unqualified voters (specifically, persons not residents of the parish) voted in the election. The judgment appealed from maintains a defendant exception of no cause of action and dismisses the suit. However, Judge LeSueur allowed the plaintiff to go forward with his evidence by proffer. As we prefer to decide the matter on the merits, we consider the entire record, including the proffered evidence.
The evidence so presented by plaintiff-appellant cannot possibly justify the reversal of the judgment of the court below and the voidance of this election.
For example, plaintiff-appellant has contended that “some 25 persons” were allowed by various commissioners to vote even though “they were not registered voters in the precincts where they voted.” The said 25 names had been obtained from the polling list by appellant’s counsel. However, a careful comparison of these 25 names with the original registration cards (which voters sign when they vote) — introduced as evidence by counsel for appellee— reveals that these individuals quite apparently not only were registered but signed their registration cards as having voted.
What clearly appears to have occurred is an accumulation of occasional instances of spelling mistakes and name confusion on the part of the individuals who wrote the voters’ names down on the polling lists as they voted. However, these names — as well as the very pattern of the polling list errors — make it possible to discern the actual and precise names of the 25 registrants voting.[1] This would appear to be a rather easy error in transcription to make in the course of maintaining polling lists, especially during those periodic instances when vot *83 ers appear at the polling places in groups and individuals — who are not stenographers — have to rush to keep up with the influx. In an election in which approximately 9,000 people voted, 25 such marginal bookkeeping errors indeed would appear to be a rather small sampling, one — in any case — net related to fraud or even error with regard to the election outcome.
Plaintiff-appellant additionally produced the names of some individuals who cast absentee ballots when, allegedly, they lived outside of the parish. A case-by-case review of these individuals indicates that the evidence does not support a conclusion that they actually occupied permanent domiciles outside of the parish. It would not have been sufficient enough, standing alone, to remove their names from the registration cards and disenfranchise them. Correspondingly, it was not of sufficient weight to undo their vote and void the election. At the most, one is compelled to conclude that in several of these instances, the individuals concerned may have temporarily been out of the parish, for varying periods, while continuing to regard the parish as their home, inasmuch as they continued to maintain their voting registration there.[2]
The remaining few samples of “voting irregularity” cited by appellant also are matters of no significance whatever, such as the one and the same married woman registered as “Mrs. J. R. Schexnayder” voting absentee as “Ethel Schexnayder.”
In summary, although the election was remarkably close there is no hint that it was not an honest one. To the contrary, considering the large number of citizens who voted and the relative paucity of complaints about impropriety, it appears to stand as a very fair and well run election.
For the reasons assigned, the judgment appealed from is affirmed insofar as it dismisses plaintiff’s suit.

AFFIRMED.

. For every voter’s name on the poll list that is not in the precinct register, there is a voter’s name in the precinct register that is not on the poll list: there was not one vote in any precinct more than the number of voters who signed their registration cards in the precinct registers as voting on the day of the election. We cite as an example Ward 1 Precinct 1, said to have three votes from unregistered persons but all three are identifiable as registered voters who signed the precinct register.
One of the three names plaintiff cites is a simple error in middle initial: Sherry R. [A.] Burnett. Plaintiffs witness’s spelling Bemette, repeated in plaintiffs brief, may be present in some other poll list but not in the one in evidence. In any case, the “duplicate” poll lists required by La.R.S. 18:561 may be written by two different commissioners, each with its own misspellings and other mistakes, or, if one is the result of copying the other, new mistakes may occur in the copying. We found five other misspellings in the poll list’s first 36 names (Ullysses [Ulysses] Washington; Authur [Arthur] J. Murry; Warner S. Esnealt [Esneault]; Randall J. Schexhayder [Schexnayder]; Geffo-ry [Geoffrey] F. [no middle initial] Deville; and Hope Zergingue [Zeringue]). It is downright unreasonable to assert that such poll list errors should invalidate a close election.
The other two names on that precinct’s poll list but not in the precinct register are explained as commissioner error greater but no more fraudulent than misspellings. One of those two names, “James M. Bourgeois,” appears following Mrs. Gloria M. Troxclair, Gay M. Troxclair (both of Box 462, Gramercy) and Mrs. Carlo Mancuso, and preceding Audrey M. Bourgeois. The signature of James N. Trox-clair, also of Box 462, Gramercy, was entered on his card in the precinct register as voting in this election but his name does not appear on the poll list. Obviously it was James N. Trox-clair who voted with his family but who was named by commissioner error on the poll list as James M. Bourgeosi — using Audrey M. Bourgeois’s last name and middle initial. (Similarly “Clarence M. Roussel,” followed on the poll list by Dawn Roussel, turns out to be Clarence M. Poche, whose signature in the precinct register shows he voted but whose name does not appear as such on the poll list.
Defendant’s brief identifies most of the names questioned by plaintiff. We do not accept defendant’s briefs attachment as evidence but as argument, because it is no more than a recital of what is contained in the poll lists and precinct registers which are in evidence. Even where defendant’s brief is incorrect, we have verified every name and the evidence does indeed explain all alleged instances as mere com *83 missioner error in transcribing names. In every single case we verified the correct name of the voter (in several instances plaintiff simply misreads the poll list), and that that voter’s registration card was signed as voting on December 8, 1979, and that that voter’s name does not appear on the poll list other than at the number on the list challenged by plaintiff.
We do note instances in which defendant’s brief errs but the result is nevertheless correct. For example, “Linda Joseph,” poll list no. 439 in Ward 6 Precinct 1, in fact reads “Glenda Joseph” on the poll list and registered voter Glenda Joseph did vote on December 8. Defendant’s explanation that this voter was Linda Joseph Jones whose name is not elsewhere on the poll list is wrong; “Linda J. Jones” does appear on the poll list at no. 1441. Similarly defendant errs in asserting “Loretta D. Steib” was Lucille Dumas Steib (because “Lucille D. Steib” did vote, at no. 638 on the poll list), but Claretta D. Steib also signed the precinct register as voting that day and we do not find “Claretta" on the poll list: undoubtedly “Loretta” is only a misspelling of “Claretta.” Similarly “Mazie Dumas” may be either Esther Marie Dumas (whose signature for many elections has been “Marie Esther Dumas”) or Marie S. Dumas; there is only one “Marie” on the poll list, and no Esther, and “Mazie” is presumably “Marie.”
We also note that “Monia [Madonna] Triche” signed her precinct register card once after October 27, 1979 — presumably on December 8 because no other election has intervened — but her last signature is undated.
We repeat that there is not a single case of an illegal vote among the 25 plaintiff challenges.

. For example, there was testimony that one absentee voter had spent the bulk of his time for the last year and a half in Mobile, Alabama, where he and a partner had a part interest in some business. There was also testimony of another absentee voter’s being in Lakeland, Florida, for a similar period, working with his father-in-law in the jewelry department of a Wilson’s store. This testimony simply does not establish that either of those absentees did not retain a residence in St. James Parish (notwithstanding other living arrangements out-of-state), which is all that is required under La. R.S. 18:101. The most doubtful of all of the cases cited by plaintiff is that of Jan Millet Donaldson, whose own testimony makes it unclear whether she has any residence in St. James Parish: she has a residence in St. John the Baptist Parish for almost a year and is about to have a house built on her land in St. James Parish but she does not testify of maintaining a residence in St. James, as, for example, at her parents’ home. Even so, that is only one doubtful vote and, because that vote was cast in person on a voting machine, it is not possible to know for whom that vote was cast; thus that vote’s elimination does not cast any doubt on the outcome of the election.